**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAURA LEIGH,

          *Plaintiff-Appellant,*

    v.

KEN SALAZAR, Secretary, U.S.
Department of the Interior; BOB
ABBEY, Director, Bureau of Land
Management; RONALD WENKER,
Nevada State Director of Bureau
of Land Management,

          *Defendants-Appellees.*

No. 11-16088

D.C. No.
3:10-cv-00597-
LRH-VPC

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
January 9, 2012—San Francisco, California

Filed February 14, 2012
Amended April 16, 2012

Before: J. Clifford Wallace, John T. Noonan, Jr., and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by Judge Wallace

## COUNSEL

Gordon M. Cowan (argued), Reno, Nevada, and Bruce A. Wagman, Schiff Hardin LLP, San Francisco, California, for the plaintiff-appellant.

Nicholas A. DiMascio (argued), Ignacia S. Moreno, and David S. Shilton, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Lucy A. Dalglish, Gregg P. Leslie, Kristen Rasmussen, and Derek D. Green, Arlington, Virginia, for Amicus Curiae The Reporters Committee for Freedom of the Press, and Mickey H. Osterreicher, East Amherst, New York, for amicus curiae National Press Photographers Association.

## ORDER

The opinion filed on February 14, 2012 is amended as follows:

On slip opinion page 1775, line 33, add the following sentence after "wild horses that should be removed.":

> And the BLM's Record of Decision authorizes the BLM to gather additional Silver King horses through 2013.

With this amendment, the panel has voted to deny the petition for rehearing.

Subsequent petitions for rehearing or rehearing en banc may not be filed.

---

**OPINION**

M. SMITH, Circuit Judge:

Plaintiff-Appellant Laura Leigh, a photojournalist, contends that viewing restrictions at a Bureau of Land Management (BLM) horse roundup violated her First Amendment right to observe government activities. Leigh moved for a preliminary injunction to require the BLM to provide her with unrestricted access to horse roundups. The district court denied Leigh's motion, concluding that most of the relief sought was moot because the roundup ended in October 2010. Alternatively, the district court concluded that Leigh was unlikely to succeed on the merits because the restrictions did not violate the First Amendment.

We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we reverse. Because the preliminary injunction motion seeks unrestricted access to future horse roundups, and not just the one that took place in 2010, this case is not moot. As to the merits of Leigh's First Amendment claim, the district court erred by failing to apply the well-established qualified right of access balancing test set forth in *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1, 8-9 (1986). Courts have an unyielding duty to thoroughly analyze whether the government has violated this fundamental constitutional right, which "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of selfgovernment," *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). Accordingly, we remand this case for the district court to consider in the first instance whether the public has a First Amendment right of access to horse gathers, and, if so, whether the viewing

restrictions are narrowly tailored to serve the government's overriding interests.

## FACTUAL AND PROCEDURAL BACKGROUND

The Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340, grants the BLM jurisdiction over all wild horses on federal lands. If the BLM determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [the BLM must] immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2).

The BLM controls overpopulation by conducting horse gathers, also known as roundups, in which it uses helicopters to herd the horses toward a temporary gather corral. Once the horses are secured in the corral, the weaker horses are separated from the stronger ones. The horses are then moved by pick-up or semi-trailer to a temporary holding corral, where some are prepared to be shipped for adoption. The BLM allows the public to observe horse gathers, but it restricts the viewing locations to protect the public from wild horses, helicopters, and vehicles. The BLM conducted a horse gather from September 25, 2010 through October 13, 2010 at the Silver King Herd Management Area (Silver King) in Lincoln County, Nevada, after determining that an overpopulation of horses was depleting natural resources and posing a danger to drivers on the nearby highway. Approximately 500 wild horses were captured. The BLM allowed daily public viewing, and also scheduled two public observation days, during which it led groups of up to ten observers, and provided BLM employees to answer questions about the gather.

Leigh, a photojournalist for Horseback Magazine, reports about the BLM's horse gathers, and asserts that there is "no true oversight or accountability" over the gathers. Leigh participated in the September 28, 2010 observation day at Silver

King, and she also observed the gather on non-observation days. The BLM staff and law enforcement officers imposed restrictions to "ensure that the public does not get in the way of gather operations and follows necessary safety precautions." The restrictions included designated viewing areas and requirements that observers sit down or remain quiet during parts of the gather.

On September 22, 2010, Leigh filed a complaint in which she alleged that the BLM's restrictions violated her First Amendment rights. Leigh also filed motions for a temporary restraining order and a preliminary injunction. On September 27, 2010, the district court denied the motion for a temporary restraining order. Leigh then filed the present amended motion for a temporary restraining order and amended motion for a preliminary injunction, in which she asks the court to require the BLM to provide her with unrestricted access to the roundup of "all horses captured from Silver King." She also seeks various forms of affirmative relief, which could be summarized broadly as: (1) requiring the BLM to create a system to track the horses' locations after capture; (2) requiring the BLM to provide the public with access to such information without having to file a Freedom of Information Act (FOIA) request; and (3) requiring the BLM to allow the public to view the horses at holding facilities and after the gather.

On November 16, 2010, after the Silver King gather was complete, the district court held an evidentiary hearing on the preliminary injunction motion. Leigh testified that she was escorted by the BLM's staff during the first day of the gather, and that the BLM's staff, including armed guards, brusquely instructed the observation group where to stand. She observed the horses being moved into a netting area, but hills obstructed her view of the horses being captured in the metal panels. She also claims that she could not view the contractors sorting the horses into various pens, nor was she able to view whether the horses were injured. Leigh alleges that the BLM's contractors prohibited her from accessing certain areas even

though other members of the public were permitted in those areas. Two other witnesses, Elizabeth Slagsvol and Debbie Coffey, also testified that the BLM made it difficult to observe the gather.

Chris Hanefeld, the BLM public affairs specialist who oversaw public observation of the 2010 horse gather at Silver King, testified that Leigh was not denied access that others received. Hanefeld testified that the restrictions were intended to avoid spooking the horses as they entered the trap. He acknowledged that the BLM instructed observers to remain seated and not to move, even when they were far away from the horses.

On April 13, 2011, the district court denied the motions for a temporary restraining order and a preliminary injunction. The district court concluded that the bulk of Leigh's requests for injunctive relief are moot: "because the gather has been completed, there is no conduct to enjoin." Even if Leigh's request was not moot, the district court ruled, she has failed to demonstrate likelihood of success on the merits as to her request to be allowed unrestricted access to the gather:

> Leigh has made no showing that she was denied access to the Silver King Gather, or that other members of the media were treated more favorably. Leigh has not proven that she was denied access to gather activities or that other members of the media received special treatment. Rather, the evidence before the court established that Leigh was provided comparable access to, and observation of, the Silver King Gather as other members of the public and media.

The district court also denied Leigh's other requests for affirmative injunctive relief regarding other horse gathers and information about wild horses, summarily concluding that "Leigh has made no showing that she is likely to succeed on

the merits of her First Amendment claim as it relates to access to facilities, agency information, or the creation of a tracking system." Leigh timely appealed the denial of the preliminary injunction.

## STANDARD OF REVIEW

We review the district court's legal conclusions de novo, and its application of the preliminary injunction factors for abuse of discretion. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). We review the district court's factual determinations for clear error. *Klein v. City of San Clemente*, 584 F.3d 1196, 1200 (9th Cir. 2009).

## DISCUSSION

A court may grant a preliminary injunction only if the plaintiff establishes four elements: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm absent a preliminary injunction; (3) the balance of equities tips in the plaintiff's favor; and (4) injunctive relief is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The district court based its holding on the first element, concluding that Leigh was unlikely to succeed on the merits because most of her claim was moot and she did not state a valid First Amendment claim. We disagree with both conclusions.

## I. Mootness

**[1]** The mootness doctrine "requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). "[I]f events subsequent to the filing of the case resolve the parties' dispute, we must dismiss the case as moot[.]" *Id.*

The district court held that because the gather that took place in Silver King in 2010 is complete, Leigh's requests for unrestricted access are moot.

[2] If Leigh's preliminary injunction motion were limited to the 2010 gather in Silver King, we might agree with the district court. However, Leigh's preliminary injunction motion concerns "all horses captured from Silver King," and is in no way limited to the 2010 gather. Therefore, the motion applies to all future horse gathers at Silver King. Although the government asserts that there are no current plans for future roundups at Silver King, it cannot rule out the possibility because the Wild Free-Roaming Horses and Burros Act requires the BLM to "immediately remove" excess horses from overpopulated federal lands. 16 U.S.C. § 1333(b)(2). Indeed, there is an estimated horse population annual growth rate of 20 to 25 percent in the Silver King Herd Management Area. Furthermore, the BLM only gathered 504 wild horses during the 2010 roundup, even though it had determined that there were 546 excess wild horses that should be removed. And the BLM's Record of Decision authorizes the BLM to gather additional Silver King horses through 2013. Thus, there is a real possibility of another horse gather in Silver King. Although the preliminary injunction does not apply to horse gathers conducted in other locations, it is not moot as applied to future gathers in Silver King.

The government contends that *In Defense of Animals v. United States Department of Interior*, 648 F.3d 1012 (9th Cir. 2011), supports the district court's mootness decision. In that case, an animal rights group filed a motion for a preliminary injunction and temporary restraining order on August 5, 2010 to stop the initial phase of a roundup of horses scheduled to begin on August 9, 2010 and to last 45 to 60 days. *Id.* at 1013. The district court denied the motion, and the roundup occurred. *Id.* On appeal, we found that the "interlocutory appeal from the denial of a preliminary injunction is moot because the roundup sought to be enjoined has taken place."

*Id.* at 1013. *In Defense of Animals* is inapposite because the preliminary injunction motion in that case sought only to enjoin the initial stages of a single roundup that had already been completed. In contrast, Leigh's preliminary injunction motion is not limited to one roundup.

Moreover, the district court's mootness ruling applied only to Leigh's request for unrestricted access to horse gathers at Silver King. The district court did not find that Leigh's requests for three general forms of affirmative relief were moot. Leigh has waived requests for two forms of relief — requiring the BLM to create a horse tracking system, and requiring BLM to provide the public with access to information about horses without filing a FOIA request — because she failed to raise them in her opening brief. *See Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) ("We review only issues which are argued specifically and distinctly in a party's opening brief.") (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)). However, Leigh's opening appellate brief reiterates her request for the third form of relief: access to horses after they are gathered. The government contends that this request also is moot. In her opening brief, Leigh identifies only one holding facility to which she was denied access: the Indian Lakes Short-Term Holding Facility in Fallon, Nevada. Leigh participated in a public tour of this facility on June 3, 2011, and the BLM plans to offer periodic tours of the facility in the future. However, this limited access does not render Leigh's entire request moot because it does not provide her with the *unrestricted* access to the holding facility that she seeks in her preliminary injunction motion.

**[3]** In sum, the completion of the 2010 gather does not render the preliminary injunction moot because it still could apply to future horse gathers at Silver King, and to Leigh's request for unrestricted access to horses in holding facilities after they are gathered.

## II.  First Amendment

The gravamen of Leigh's complaint is that the BLM's viewing restrictions violated her First Amendment right to observe governmental activities.[1]

Open government has been a hallmark of our democracy since our nation's founding. As James Madison wrote in 1822, "a popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." 9 WRITINGS OF JAMES MADISON 103 (G. Hunt ed. 1910). Indeed, this transparency has made possible the vital work of Ida Tarbell, Rachel Carson, I.F. Stone, and the countless other investigative journalists who have strengthened our government by exposing its flaws.

**[4]** The First Amendment prohibits any law "abridging the freedom of speech, or of the press [.]" U.S. Const. amend. I. Although the First Amendment does not enumerate special rights for observing government activities, "[t]he Supreme Court has recognized that newsgathering is an activity protected by the First Amendment." *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978); *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

**[5]** To provide this First Amendment protection, the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities. The right originated in a series of cases in which the media sought

---

[1]In her opening brief, Leigh also argues that the BLM's viewing restrictions violated the First Amendment because they were a prior restraint, which "exists when the enjoyment of protected expression is contingent upon the approval of government officials." *Dream Palace v. Cnty. of Maricopa*, 384 F.3d 990, 1001 (9th Cir. 2004). At oral argument, Leigh's counsel conceded that the BLM's restrictions are not a prior restraint, and therefore we need not address that argument.

to observe criminal judicial proceedings. In *Richmond News-papers, Inc. v. Virginia*, 448 U.S. 555 (1980), newspaper reporters challenged an order that excluded the public from a murder trial. *Id.* at 560. The Supreme Court reversed the closure order, and held that the First Amendment provides the public with a right to attend the trial. In the opinion announcing the judgment, Chief Justice Burger wrote that "[f]ree speech carries with it some freedom to listen," and that "the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted." *Id.* at 576. Two years later, in *Globe Newspaper Co.*, the Supreme Court struck down a state law that excluded the public from the trial testimony of children who were victims of sex crimes. The Court recognized "the common understanding that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." 457 U.S. at 604 (internal citation and quotation marks omitted).[2]

[6] In *Press-Enterprise II*, the Supreme Court articulated a two-part test for right of access claims. First, the court must determine whether a right of access attaches to the government proceeding or activity by considering 1) "whether the place and process have historically been open to the press and general public" and 2) "whether public access plays a signifi-

---

[2]*See also Press-Enter. II*, 478 U.S. at 8-14 (recognizing right of public access to preliminary hearings); *Press-Enter. Co. v. Superior Court* ("*Press-Enter. I*"), 464 U.S. 501, 510-11 (1984) (holding that media have a right of access to voir dire); *In re Copley Press Inc.*, 518 F.3d 1022, 1027 (9th Cir. 2008) ("the public has a qualified First Amendment right to access [defendant's] plea colloquy transcript"); *Phoenix Newspapers v. United States Dist. Court*, 156 F.3d 940, 946-51 (9th Cir. 1998) (holding that district court erred by denying public access to transcripts of hearings that took place during jury deliberations in criminal trial); *Oregonian Publ'g Co. v. United States Dist. Court*, 920 F.2d 1462, 1468 (9th Cir. 1990) (granting newspaper company's petition for writ of mandamus to require district court to unseal plea agreement).

cant positive role in the functioning of the particular process in question." 478 U.S. at 8-9. Second, if the court determines that a qualified right applies, the government may overcome that right only by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9 (internal citation omitted).[3]

[7] The government argues that the *Press-Enterprise II* framework is limited to attempts to access criminal trials. We disagree. Although *Press-Enterprise II* and the other early right of access cases involved criminal judicial proceedings, we have applied this analytical framework in other settings. In *Cal-Almond, Inc. v. United States Department of Agriculture*, 960 F.2d 105 (9th Cir. 1992), we applied the *Press-Enterprise II* analysis to the plaintiff's attempt to force the U.S. Department of Agriculture to provide it with a list of California almond growers eligible to vote in an agricultural marketing order referendum. *Id.* at 109. We concluded that "there is a substantial question whether the interests asserted by the government would override the right of access asserted" by the plaintiff, but we ultimately chose to avoid ruling on the constitutional question because the statute that governs agricultural marketing orders could instead be interpreted as requiring public access. *Id.* at 109-10. Similarly, in *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th

---

[3]Amici Curiae The Reporters Committee for Freedom of the Press and National Press Photographers Association argue that we should analyze the restrictions as a violation of the First Amendment right to expression in a public forum. Amici rely on *Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir. 1988), in which we held unconstitutional a state statute that restricted media organizations' exit polling. *Id.* at 386. Although we concluded that the right of access might apply to those restrictions, we instead applied public forum analysis because the exit polling statute restricted the "discussion between pollster and voter." *Id.* at 384. Of course, such a dialogue is not present here because no one can have a conversation with a horse. *See* JAY LIVINGSTON AND RAY EVANS, MISTER ED THEME SONG. Thus, the right of access analysis is the more appropriate standard for this case.

Cir. 2002), we reviewed a district court's ruling that prohibited a state prison "from preventing uninterrupted viewing of executions from the moment the condemned enters the execution chamber through, to and including, the time the condemned is declared dead." *Id.* at 886. Applying a modified *Press-Enterprise II* test, we affirmed the district court's conclusion. *Id.* at 873-86.[4]

[8] Many other courts have applied the *Press-Enterprise II* framework to evaluate attempts to access a wide range of civil and administrative government activities.[5] These cases reflect

---

[4]We applied the first prong of *Press-Enterprise II* to determine whether a right of access attached to executions. However, because courts are more deferential to prison regulations, we required the government to show that the restrictions were "reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns." 299 F.3d at 878 (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987)). Because this case does not involve prison regulations, it is unnecessary to modify the *Press-Enterprise II* analysis here.

[5]*See, e.g., United States v. Miami Univ.*, 294 F.3d 797, 821 (6th Cir. 2002) (applying *Press-Enterprise II* analysis to attempts to access university's student disciplinary records); *Whiteland Woods, L.P. v. Township of W. Whiteland*, 193 F.3d 177, 181 (3d Cir. 1999) (planning commission meetings); *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1174 (3d Cir. 1986) (state environmental agency records)*; Alexandria Real Estate Equities, Inc. v. Fair*, No. 11 Civ. 3694 (LTS), 2011 U.S. Dist. LEXIS 138455, at *4-6 (S.D.N.Y. Nov. 30, 2011) (arbitration award records); *Ginsberg v. DeHart*, 1:10-cv-00452-JAW, 2011 U.S. Dist. LEXIS 31124, at *37-38 (D.N.H. Mar. 22, 2011) (attorney disciplinary proceeding records); *In re September 11 Litig.*, 723 F. Supp. 2d 526, 530-31 (S.D.N.Y. 2010) (settlement records in property damage litigation); *In re Guantanamo Bay Detainee Litig.*, 630 F. Supp. 2d 1, 10 (D.D.C. 2009) (habeas corpus proceedings); *ACLU v. Holder*, 652 F. Supp. 2d 654, 662 (E.D. Va. 2009) (sealed qui tam complaints); *Chase v. Pub. Util. Comm'n*, Civil Action No. 1:05-CV-2375; 2008 U.S. Dist. LEXIS 25702, at *21 (M.D. Pa. Mar. 31, 2008) (transcripts of state utility commission meetings)*; Cincinnati Enquirer v. Cincinnati Bd. of Educ.*, 249 F. Supp. 2d 911, 915 (S.D. Ohio 2003) (resumes of candidates for school superintendent)*; Uniontown Newspapers, Inc. v. Roberts*, 839 A.2d 185, 191 (Pa. 2003) (legislator's telephone records); *Mayhew v. Wilder*, 46 S.W.3d 760, 776-77 (Tenn. Ct. App. 2001) (meetings of state legislature); *Boston Herald, Inc. v. Sharpe*, 737 N.E.2d 859, 869 (Mass. 2000) (divorce records); *Johnson Newspaper Corp. v. Melino*, 564 N.E.2d 1046, 1048 (N.Y. 1990) (dentist's professional disciplinary hearing).

the common understanding that the *Press-Enterprise II* right of access test is not limited to criminal judicial proceedings. Accordingly, we hold that the *Press-Enterprise II* test applies to Leigh's claim that the BLM's viewing restrictions violate her First Amendment rights. *Press-Enterprise II* balances the vital public interest in preserving the media's ability to monitor government activities against the government's need to impose restrictions if necessary for safety or other legitimate reasons.

Under this framework, a court cannot rubber-stamp an access restriction simply because the government says it is necessary. By reporting about the government, the media are "surrogates for the public." *Richmond Newspapers*, 448 U.S. at 573 (Burger, C.J., announcing judgment); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490-91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate. *See* Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 STAN. L. REV. 927, 949 (1992) ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence."). If a government agency restricts public access, the media's only recourse is the court system. The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press. Thus, courts have a duty to conduct a thorough and searching review of any attempt to restrict public access.

**[9]** The district court's order denying Leigh's motion for a preliminary injunction fell short of the rigorous scrutiny that *Press-Enterprise II* requires. The district court focused mostly

on its conclusion that Leigh was not treated differently than other members of the public, a consideration that is not part of the *Press-Enterprise II* balancing test. The district court also implied that Leigh's First Amendment claim was unlikely to succeed because she did not show that she was denied access. The relevant question is not whether the BLM prohibited Leigh from observing the horse gather altogether; as in *California First Amendment Coalition*, the issue here is whether the viewing *restrictions* were unconstitutional. On that question, the district court failed to conduct the proper First Amendment analysis. The district court did not consider whether horse gathers have traditionally been open to the public, whether public access plays a positive role in the functioning of horse gathers, whether the BLM has demonstrated an overriding interest in the viewing restrictions, or whether the restrictions are narrowly tailored to serve that interest. *See Press-Enter. I*, 464 U.S. at 510 ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."). Because these questions are fact-intensive and likely require further evidentiary development, it would be inappropriate for us to rule on them based on the district court order and record. *See Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 910 (9th Cir. 2008) ("If issues of fact exist, we must remand to the district court to conduct, as necessary, further evidentiary proceedings to resolve those issues.").

**[10]** Accordingly, we reverse the denial of the preliminary injunction. We remand this case for the district court to conduct the analysis that *Press-Enterprise II* requires. First, the district court must determine whether the public has a right of access to horse gathers by considering whether horse gathers have historically been open to the general public and whether public access plays a positive role in the functioning of gathers. Second, if the district court determines that a right of access exists in this case, it must determine whether the BLM has overcome that right by demonstrating an overriding interest that the viewing restrictions are essential to preserve

higher values and are narrowly tailored to serve those inter-
ests.

## CONCLUSION

For the foregoing reasons, we reverse and remand to the
district court for proceedings consistent with this opinion.

## REVERSED AND REMANDED.

WALLACE, Senior Circuit Judge, concurring in part and dis-
senting in part.

Judge Smith has crafted an excellent opinion and I agree
with nearly all of it. I agree that Leigh's request for prelimi-
nary injunctive relief is not moot. I also agree that *Press-
Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (*Press-
Enterprise II*), provides the proper test for Leigh's claims that
she was denied access to horse gathers and horse holding
facilities in violation of her First Amendment rights. I dis-
agree, however, that the district court's error in failing to
apply *Press-Enterprise II* requires us to reverse and remand.

As Judge Smith correctly points out in his opinion, Leigh
has not identified any evidence in the record to establish an
historical tradition of public access to horse gathers or holding
facilities. Because the district court applied the wrong legal
standard, remanding to allow Leigh to attempt to present evi-
dence that would establish those facts is one way to proceed.
Judge Smith has selected that option. But when we review a
denial of a preliminary injunction, "we may affirm the deci-
sion of the district court if the result is correct, even if the dis-
trict court relied on a wrong ground or gave a wrong reason."
*Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 676 (9th Cir.
1984); *see also Schenck v. Pro-Choice Network*, 519 U.S.
357, 384 n.12 (1997) (rejecting the argument that failure to

endorse district court's reasoning requires reversal); *Official Airline Guides, Inc. v. Goss*, 856 F.2d 85, 87 (9th Cir. 1988) (affirming the denial of a preliminary injunction on different grounds than relied on by the district court and remanding to determine whether the plaintiff is entitled a *permanent* injunction).

In presenting evidence to the district court to support her motion for preliminary injunction, Leigh did not even attempt to establish the existence of an historical tradition of public access to horse gathers or holding facilities. Therefore, even if the district court had applied the correct legal rule that Judge Smith's opinion adopts, it would have been obliged to deny the motion for failure to prove a likelihood of success on the merits. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The necessary facts were not presented. Even though it relied on a wrong ground, the district court reached the correct result. Therefore, we ought to affirm the denial of the preliminary injunction, and remand for the determination whether, applying the correct legal standard, Leigh is entitled to *permanent* injunctive relief. *See Official Airline Guides, Inc.*, 856 F.2d at 87.

Furthermore, the majority's course of action conflicts with the purpose of preliminary injunctions. Preliminary injunctions normally serve to prevent irreparable harm by preserving the status quo pending a trial or other determination of the action on the merits. *Chalk v. U.S. District Court*, 840 F.2d 701, 704 (9th Cir. 1988). Here, Leigh's request for preliminary injunctive relief "goes well beyond simply maintaining the status quo." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). She asks the court to order the BLM to provide Leigh with all the access she demands immediately. Mandatory preliminary injunctions, such as Leigh seeks, are particularly disfavored and should be denied "unless the facts and law clearly favor the moving party." *Id.* (internal quotations omitted). Here, there were no necessary facts.

Reversing and remanding for further factual development for the preliminary injunction is also unwise because it will only cause more delay. We have cautioned parties against appealing decisions on preliminary injunctions "in order to ascertain the views of the appellate court on the merits of the litigation." *Sports Form, Inc. v. United Press Int'l. Inc.*, 686 F.2d 750, 753 (9th Cir. 1982). The limited scope of our review and the limited factual records that accompany appeals from preliminary injunctions (usually consisting of affidavits) often prevent us from providing appropriate guidance on the merits. *Id.* at 753. Often, the testimony of witnesses at trial is different from the affidavits (often authored by lawyers) presented at a preliminary injunction hearing. The applicable law may change based on the full record of live testimony. Thus, appeals from preliminary hearings may waste time and judicial resources. *Id.* In other words, preliminary injunction motions are not the "main show."

Because the district judge granted the joint motion by the parties to stay the proceedings in the district court pending this appeal, this case has already delayed the final resolution by approximately nine months with no progress toward trial. By the time the district court lifts the stay, the delay may be much longer, as the district court must take more preliminary evidence, make preliminary factual findings, and undertake the difficult task of gauging Leigh's likelihood of success, the threat of irreparable harm, the balance of the equities, and the public interest. After this difficult process, one or both of the parties might again appeal the district court's interlocutory decision. As we stated in *Sports Form*, "it is likely that this case . . . could have proceeded to a disposition on the merits in far less time than it took to process this appeal." 686 F.2d at 753. Similarly, it is likely that, on remand, the most efficient course would be to proceed to a disposition on the merits.

I prefer to end the detours now. Sending this case back without directing more preliminary injunction activity would

encourage the district court and the parties to get on with the trial. It is within our power to do so. While I enthusiastically join Judge Smith's analysis and holdings on the law, I dissent from the judgment to reverse and remand for further proceedings on the preliminary injunction motion. I would affirm and remand for a determination whether Leigh is entitled to *permanent* injunctive relief: get to trial as soon as possible.